is United States v. Portela Martinez. We'll hear first from Mr. Goodman. Good morning. Please the court. Adam Goodman on behalf of Ivette Portela Martinez. I'm going to use the brief portion of the time that I've reserved to solely focus on I think the issues that are most important to Ms. Portela as there is a co-defendant and a lot of things might overlap. I think the main argument that came up at trial that Ms. Portela needs to bring before the court was the issue of mens rea. The government in this particular case did prove fraud at A&B but still had to prove that Ms. Portela herself knowingly and willfully joined that fraud and possessed the specific intent required for wire fraud. Ms. Portela was not the owner of the left the business on February 23, 2017. Despite the government producing evidence that her login credentials were used after she left, that was the evidence. So there was evidence to show that her login credentials, which was the crux of their case, were being used when she had already left. She was not charged with a false statement. Her role at the facility was as a data entry. She was working as a pharmacist. She recruited Dr. Giron and she worked at site support. Let me ask you a question at the outset. Yes. One of the witnesses in the case was a co-conspirator. Correct. Garmendia. Yes. Garmendia testified in no uncertain terms that your client knowingly participated in the scheme. He said that she forged patient signatures on the consent forms, that she provided the samples to be assigned to fake patients, entered fraudulent data in the clinical trials, etc. If the jury believed her, him, why wasn't that sufficient to find guilt beyond a reasonable doubt as to the mens rea? So I believe that there were some issues that came up with regard to how they were complying with the rules. There was a regulatory inspection where we were not able to get into the fact that all the documents were shown to the FDA and the FDA ultimately said that everything looked like it's OK. And she is just acting as if everything's OK. Again, she works under her husband. And I think a lot of what Garmendia said was contradicted ultimately, again, by the fact that even though he did say X, Y and Z before trial or during trial, ultimately, we were able to actually prove that he was not telling the truth. So the jury. Right. But the jury was free to believe him. Right. But that's a credibility determination. It is a credibility determination. I think there was some evidence that spilled over from the codefendant. And again, I think in this particular situation, that has that has nothing to do with the actual wire portion that has to do with with regulatory issues, with how the actual study. Well, wasn't there also evidence that she had recruited her own daughter to be a fake subject? So there was evidence that there was evidence that came out that a Claudia Puerta was a participant in the study. The evidence showed that Miss Puerta participated in a prior acne study. But there was evidence that she was a participant in this, that a Claudia Puerta, not a Claudia Puertas. There was no testimony from the daughter that was actually her daughter. The government said it's her daughter, but they never produced anything to actually support that. They just kept saying that. But there was no actual evidence with regard to that. And again, when the actual wire occurred in October 2017, she was not working there. She was not an employee of the facility. So I think that has a lot to do with the conspiracy versus the actual conducting of the wire. All right. Thank you very much. And you've reserved one minute, Mr. Goodman. We'll hear next from Miss Cain. Good morning, Your Honors. May it please the Court, Sarah Cain on behalf of Mr. Montalvo-Villa. I would like, with the Court's permission, to focus on the two violations of Mr. Montalvo-Villa's right to present a defense. But first, briefly, I do need to respond to what I perceive to be a new argument in the government's 28-J response filed last week. The government in their 28-J says that Mr. Montalvo-Villa waived his Fifth Amendment right by affirmatively maintaining his innocence at sentencing. And I have to presume that the government is talking about his counsel PSR objections. And I need to say, there are three and a half reasons that the Court cannot apply the Fifth Amendment, consider PSR objections to be a Fifth Amendment waiver. The first is that the Fifth Amendment right is personal to the defendant. Counsel can't waive it. So counsel filings, not a Fifth Amendment waiver. Waivers also have to be knowing and intelligent, and they're not presumed lightly. There's no indication in the PSR objections that Mr. Montalvo-Villa understood those to be a waiver of his Fifth Amendment right to silence. PSR objections are also non-testimonial. We know that because a defendant, Mr. Montalvo-Villa, could not have been prosecuted for any oral or written advocacy by his attorney. So those three combined tell us that written PSR objections, the Fifth Amendment doesn't apply to them, and they cannot be considered a waiver of the Fifth Amendment right. The half final reason is that this circuit has a rule where if a defendant fails to object to facts in the PSR, those facts are deemed admitted for eternity. And that rule would be unconstitutional if PSR objections were covered by the Fifth Amendment. With that said, if the court has questions about the Fifth Amendment issue, I'm happy to answer them. I also want to get to the violations of Mr. Montalvo-Villa's right to present a defense. There were two pieces of evidence that were excluded, and both of them cover two different HERN categories, or two different categories of information that is relevant, pursuant to HERN, to a theory of defense. The first is Bernardo Garmendia's roles in prior AMB trials. Now, the government before trial strenuously attempted to ensure that this evidence did not come out at trial. They had a whole pretrial hearing on it, and the magistrate judge said, you know, this is myopic. You want to present one version of the story and not the other, and I'm going to see how it comes out at trial. In fact, the magistrate judge may be seeing the writing on the wall. Can we dismiss this without prejudice with the ability to renew in the trial judge? Perhaps the reception would be better. Indeed, the reception was better at trial. Now, Bernardo Garmendia, over the government's objection, was allowed on cross-examination to testify that he never had a medical or clinical or patient-centered role in prior AMB trials. So here we have the star government witness testifying. I've never had a prior medical role. That should have entitled Mr. Montalvovia. Help me with his testimony. Did he not say, and there's no question you're cut off from a fair amount of stuff you wanted to ask, but did he not acknowledge that he was involved in the prior trials? What was the testimony that actually came out? So certainly, he acknowledged that he was involved in prior trials, but he adamantly denied having any medical experience whatsoever, including in prior trials. And so that he was involved in prior trials is essentially neither here nor there. What Mr. Montalvovia needed to be able to present, because it made his defense reasonable, that Bernardo had had an increasingly responsible patient-oriented role in prior trials, had had some clinical and medical training, essentially, informally through these trials, and that made Mr. Montalvovia's defense, which was that he relied on Bernardo Garmendia to conduct these tasks in this trial, more reasonable. So under HERN, that covers two categories. One, it made it an element of the, it was a collateral matter that, through a reasonable chain of inferences, made Mr. Montalvovia's defense more reasonable, his state of mind. It enabled him to bolster his state of mind. And two, it undermined Mr. Bernardo Garmendia's credibility, and he was a star witness. He was, in fact, the only witness who provided direct testimony that Mr. Montalvovia knew that there was fabrication of the patient data, the only witness who testified to that. So I just, I wanted to point the court also to the FDA matter, because, of course, there were two violations of Mr. Montalvo's right to present a defense. And the second one, that the FDA found no noncompliance. I think in the abstract, the government's theory or argument that this was not relevant, in the abstract, if you're not familiar with the details of this trial, that sounds, that rings correct, right? This was not a regulatory trial. However, the government tried a regulatory case. If you start with the indictment, the FDA regulations are mentioned ad nauseum, and I could go through with the indictment. It's docket entry three. The court's more than— But I mean, really, the gist of this, as I understood it, and you can let me know if I maybe misunderstood, the gist of the fraud that the government alleged was that your client had been contracted to do a C. diff trial, and that instead of actually engaging in the trial, that your client faked all of the, faked the patients, faked the samples, gave his own blood, gave his own samples, and really just faked the entire trial. So, like, that doesn't seem like a regulatory, that does not seem like solely a regulatory problem. You are correct that that is part of the theory of the prosecution's case. The defense case is that Mr. Montalvovia was on the outside of the fraud. That's the defense theory. And in order to help the jury understand why that would be reasonable, the FDA's finding was relevant, and it wasn't relevant to the government's theory of the case. And that's again— Well, tell me how it was, why it was relevant to your client's defense. If you adopt the theory, or you accept as possible, or plausible, the defendant's theory that he was on the outside of the fraud looking in, it puts him in an analogous position to the inspector who was reviewing, was aware of all of the allegations in Actillion's letter of scientific misconduct, had first-person access to all of AMB's files, interviewed Dr. Giron, interviewed Mr. Montalva, was very aware that there were serious allegations. You can review the letter of scientific misconduct to get an idea of the kind of seriousness of the allegations that the FDA inspector was aware of. And those allegations are both regulatory violations, they indicate regulatory violations, but also criminal fraud. And the regulatory inspector was not able to conclude that there were regulatory violations. Where does Dr. Giron's testimony fit into this, where she says she lied because your client essentially told her she needed to lie? So, part of that is a credibility determination, and the other is, does that prove criminal fraud or a regulatory violation? And I think the government's theory was that the heart of the fraud here, the criminal fraud, was the fabrication of patients, as you mentioned. And what Dr. Giron testified to was that Mr. Montalva via guided her through what I think would be considered regulatory violations. Her testimony is indirect or circumstantial evidence of Mr. Montalva's criminal intent, but it is not direct evidence of his criminal intent. And of course, Mr. Montalva also denied having guided Dr. Giron through lying. Let me ask you a question. You're really on our time now. Help me with the Actilon letter that came in. Did it have any relevance in this case? I don't think so. I think that it was very, very, very damaging because it contained a bunch of in the letter. It didn't say defendant A was guilty, defendant B was guilty. It just said the record, the data was false. It didn't charge Jones or Smith with having been involved in creating the falsity. Do I have that right? You see, I asked the question because just speaking for myself, I think it is hearsay. I'm hard pressed to find what relevance the letter had in terms of explaining why Actilon sent it to the FDA. I don't think that bore upon any of the issues of guilt or innocence as to either of the defendants. But to the, I really, my question is going to whether even assuming arguendo that it was error to admit it, whether the error wasn't otherwise harmless here because everybody conceded in this trial the data was all false. The only issue was who did the falsity and whether they did it with the requisite state of mind. And it struck me that that letter didn't really add very much to those questions. Have I misapprehended that? Certainly, you're entitled to that perception. I would point the court to the specific allegations in the letter against Mr. Montalvovia. I would say as to Bernardo Garmendia, Dr. Giron, Yvette Portela Martinez, nothing direct. But there are actually specific mentions of lies that the Actilon auditors, who again did not testify, believed that Mr. Montalvovia had told them. And one of them, for example, is that patients for the AMB trial were recruited through a radio ad that through the trial we all know never aired. That is a flagrant lie. And the fact that he, according to this letter, lied about that to the Actilon investigators, Actilon auditors, excuse me, it was very damaging to him because the defense rose and fell Mr. Montalvovia's credibility. So I think there is at least in that a significant harm from the letter. Thank you. Thank you. All right. And you've reserved three minutes for rebuttal. We'll hear next from Mr. Sinha. Good morning, Your Honors. May it please the court. Javier Sinha on behalf of the United States. I'd like to take the issues in the order they were raised. The Martinez's challenge of sufficiency of the evidence. We think the evidence here is more than sufficient. As the court noted, co-conspirators testified that she was aware of the fraud and was a big major part of this fraud. The jury could find that credible and this court will not second guess jury credibility determinations. I'll move on if there's no questions on that, Your Honors. The second issue is the complete defense claim about the prior clinical trials. I think it's important to first note that we're here on plain error review because defendants never raised the claim below. And so there's no error here, plain or otherwise. The jury could, excuse me, the district court could in its broad discretion determine that the evidence here was not relevant and that if it was slightly relevant to the probative value was essentially outweighed by the risk of confusing the issue. Help me with this. Just help me with the record. Absolutely. The district court excluded the findings of the FDA audit. Was there not an objection that was opposed? That's the next issue. But the defendants. That issue on this on the issue of the FDA findings. Absolutely. So defendants tried to introduce it multiple times and the government objected at trial on relevance grounds and before trial it had filed pre-trial motions alleging it couldn't be introduced as relevant or under 403. All I'm asking is that was properly preserved. That's correct, Your Honor. Okay, so what was it that was not properly preserved? The examination of Garmendia? The evidentiary claims were preserved, but defendants never raised the constitutional claim about a complete defense below. So they claimed the district court misapplied the rules of evidence, but they didn't claim that the court, which is what the constitutional claim requires, either applied a rule that is or the application of the rule was arbitrary, disproportionate, or infringed on a weighty interest of the accused. That's a different claim. The district court did not get a chance to pass on the first instance. And so the constitutional claim itself was a recouped claim. I understand. And so that being said, the district court here, ultimately the question is for a complete defense claim, could the evidence have been excluded under the standard rules of evidence? That's rules 401 and 403. The district court here could have in its discretion determined this evidence was irrelevant. Or at the very least, if it had any relevance, it was outweighed by the risk of delay or confusing the jury. Discussions of other clinical trials would have been confusing to the jury without context. Well, help me with that. Would it not have borne on the credibility of one of the co-conspirators who testified, Garmendia, that he had been involved in prior trials and evinced sufficient medical knowledge? There was no dispute the records were falsified. Wasn't this case really who did it? That's correct, Your Honor. Exactly. There's no dispute. They wanted to establish that the principal involved in the fraud was Garmendia, not them. That's correct. So why wasn't it material and relevant to establish his medical knowledge? So I think maybe for that purpose, it might be relevant. It wasn't really an argument they made below so the district court can't really be blamed for not considering it. But even if it were relevant, I think the probative value still could be outweighed by the risk of confusion or wasting time. Because discussing these other trials, which this case wasn't really about, and discussing sort of the protocols in them, the different roles of defendants in them, would take a lot of time and would confuse a jury to determine like what is the actual, what are the protocols in this trial? What are the roles of defendants in this trial? So your answer is it is an abuse of discretion because the risk of moving the center of gravity to another issue was too great. That's correct, Your Honor. If we were to think that it was error, why would it be harmless error in your view? I think it's harmless, or here we think it's a prong three of the plain error standard, so they have to prove prejudice. But either way, there's no question that in this trial, Montalvo Villa was basically in charge. He himself wrote an email saying, I'm the lead coordinator, I'm sort of in charge. Dr. Jaron testified that he was in charge. Jeff Ellis, Investigator Garmindia, all testified Montalvo Villa was the person in charge. We talked to him exclusively. He would show up at the auditors for PPD with Dr. Jaron and answer the questions for her. So here, it would be pretty unhelpful to have this one piece of possible impeachment, which of course the impeachment value only depends on how much they believe Montalvo Villa, which jury verdict here suggests they didn't believe him. But this slight impeachment that takes in there is any impeachment value would be outweighed by the overwhelming evidence that he was definitely in charge in this trial. I'm happy to move on to the issue. Even if that evidence were admitted and the jury believed that he had medical knowledge and he had lied about not having medical knowledge, how would that affect the rest of the evidence? How would that bear on the rest of the evidence, if at all? I think it would have essentially no effect. Whether he had medical knowledge or engaged in the medical part of trials beforehand, it's simply irrelevant to what happened in this clinical trial, where the evidence shows that Montalvo Villa was in charge. Well, wouldn't it have added to the proposition that there was someone else inside this small group who had the capability to pull off this fraud? I think it could have. I think there's no debate here that all three of them engaged in the fraud. But I think it's simply unbelievable to say, as defendants are saying, that in this three-person team running a clinical trial that was quite small, one person was engaging in extensive fraud. And there's no debate here that this trial was rife with fraud. There was testimony by several patients saying, I was never in this clinical trial, but my data was used, my name was used. There was testimony that Portela-Martinez's daughter was in there. And that somehow Montalvo Villa, who was a lead coordinator, and Portela-Martinez, whose role was to give the drugs to these important patients, wouldn't have noticed that these people were not actually in the trial. And so this is sort of on the margins. It's impossible to believe that in this small clinical trial, these two people who were a vital part of it somehow didn't notice that all the patients, or many of the patients, simply didn't exist, weren't coming, were their own friends and family. Help me with the FDA audit, which the district court kept out. Absolutely, Your Honor. So this audit, once again, we think is not relevant. And the court could make that decision in its discretion. Because this isn't a regulatory case. It's a case about wire fraud. And whether or not there were regulations violated here or not? No, I perfectly can accept the proposition. The standards of proof are different. The methodology is different. And there's some risk of moving the center of gravity away from what's at issue in this case. But Ms. Cain got up and said that there was something really relevant here. When you allow that into evidence, it specifically referenced that an ad had never run and that the defendant basically was lying about that proposition. I see. So this is not the FDA results. This is the Actelion letter. Right. I'm sorry. No, no problem at all. So we believe the letter was not hearsay. I'm happy to talk about that more. Why wouldn't it have been hearsay? You say it wasn't offered for the truth of its contents. What was it offered for? It was offered to show the effect on the listeners, which was Dr. Frank here, to show why he wrote the letter to the FDA and why the FDA then engaged in an audit. What relevance does that have in this case? So the audit the FDA held is the audit... If the conduct of Actelion was at issue, I could see why it would be relevant. But how does that bear on the issues the jury had to resolve regarding these two? So count three charges Montalvovia with lying to the FDA during an audit. And that audit was caused in part by the Actelion letter to the FDA saying, we found some discrepancies in the data at A and B. And so this showed why the FDA engaged in that audit, in which Montalvovia was convicted for lying to the FDA. But didn't he testify to all of that anyway? Why did the letter have to come in in addition? This letter came in on the first day of the trial. It was unclear to us if he would testify or not. And so I think it's okay for us to introduce this not for the truth of the matter, but to say this shows... Well, you say not for the truth of the matter asserted, but there it said in living color, you know, Actelon claim, blah, blah, blah, blah. Jury may very well have taken it for the truth of its contents, particularly if the relevance was at best really remote and attenuated. I think that speaks maybe more toward either a prejudice argument or a Rule 403 claim, which they didn't make below and aren't making in their opening brief. I think Montalvovia raises it briefly in his reply brief. I think at that point it's too late. I think that the question on the merits is whether the court, the district court abuses discretion in determining this was not hearsay. So let's just assume for purposes of this argument that we think it was error. So tell us why it wasn't... Tell us why it was harmless error, specifically with respect to the remark that Ms. Cain mentioned. So the only remark Ms. Cain mentioned, I believe, was that Montalvovia said he found 33 subjects through the radio ad, which was not true. There's other statements where he lies about finding subjects. Multiple emails saying he had found subjects that he hadn't found either, or he was going to find subjects through Mercy Hospital or Dr. Jerome, which he couldn't have done because she said she couldn't find subjects. So you're saying it was cumulative. It was essentially cumulative. Much of the statements in the letter were essentially cumulative. There's other testimonies saying this. As Judge Marcus noted, some of the letters mentioned that there's data discrepancies, but that's of course consistent with the fact that as no one here disputes, there was massive fraud in this trial. And so the idea that this letter somehow was prejudicial because it mentioned there's discrepancies in the data would make no sense because everyone agreed there was discrepancies in the data. The data wasn't real. And so despite that, I think the evidence is still overwhelming. So for the reasons I was discussing before, and I can get into more details, but I think the idea that there was a clinical trial that was full of fraud, where there's patients who were never even involved in the trial, didn't show up, there's friends and family of the defendants in this trial, and the people who are in charge of it and in charge of giving the drugs to these patients somehow didn't notice that is unbelievable. And the jury could frankly entirely not believe that. Let me take you back to the FDA regulatory investigation. So I think the argument on that was that that not coming in was harmful to the defendants because they wanted to show that, hey, even the FDA didn't know that there was something wrong here. How would the defendants know that there was something wrong? What is your response to that? Assuming that, just assuming for purposes of the argument, that it was error not to allow that in. I see. So assuming there's error, which we don't think there was, obviously. Again, the evidence here was overwhelming. And especially here, those results have very little probative value at all because part of the reason the FDA found no violations was because Montalvo Villa lied to the FDA regulators. And so it's not surprising to say, you know, he lied to us about everything. And so because of that, we didn't find any violations. So I think it's pretty weak evidence to begin with. And on top of that, as we've been discussing... I think they would say, well, the reason you think that he lied is because ultimately there was fraud there, but it doesn't tell us whether he was the one who was lying or he was just, he didn't know, right? I mean, that's their whole argument. He didn't know he had been bamboozled also. There's a lot of evidence that he was not bamboozled. Even before the clinical trial began, he had lied to PPD by sending in false resumes for Garmendia and for Dr. Hiron. He lied about playing the radio ad, which he never did. He, of course... Well, but again, the evidence for that was... I mean, yes, there was evidence that came out in the trial, but then there was the evidence from the letter that's where he said that he had... Well, there's separate evidence. The only thing in the letter that's not from the trial was the fact that he claimed he had found patients from the ad. But there's undisputed other evidence in the trial saying he said he told Octelion he played the ad, but he had never actually played it. Garmendia testified to that. And there's testimony from someone else saying that he'd never... I think Dr. Hiron said he never actually played the ad. So there's no question he never played the ad. There's testimony he faked the resumes to make them look more qualified. There's testimony, of course, he was heavily involved in the trial, the clinical trial. He helped fill out and sign four signatures for the informed consent forms. He helped find fake patients in the system and bring in friends and family. He helped Dr. Hiron essentially lie to auditors by forcing her to sign a letter that was false. He created fake data. He provided his own stool and blood samples, the EKG results. This is all incredibly overwhelming evidence. And so the idea that he was on the outside looking in, I think is just not believable. The evidence here is quite broad. And of course, there's two co-conspirators who testified against both defendants here. Their evidence or the testimony was corroborated by other evidence. And the jury could credit that evidence. And the last thing I'll note is that he did testify at trial and the jury could disbelieve him and take that as evidence of his guilt. I'm happy to discuss anything more if it requires any questions. I'll move on to the last issue, which is the Fifth Amendment issue. We generally agree with Montevideo that the Fifth Amendment really isn't implicated here because what the court was considering was not his silence, but his statements through his counsel during the PSR objections. We read their 28-day letter to be saying that that's covered by the Fifth Amendment. And to the extent that's what they're saying, we think the defense counsel's argument has to be at the very least a waiver of that right, if that right even exists. But in general, there's no Fifth Amendment violation here at all because the court was considering statements the defense counsel had made. If the court has no more questions on anything, I'm happy to address on the briefs. All right. Thank you, counsel. Thank you very much. Mr. Goodman, you've reserved one minute. Thank you again. Just to address what the government stated, which I think is a misinterpretation of the evidence in this particular case, where the government is stating that Ms. Bortella's role is to distribute the drugs and that she would have been the one to know, and that's why she was definitely involved in the fraud. I think that was contradicted by the evidence presented by the government. Exhibit 40 was a delegation of duties where everyone is assigned specific duties of what they are supposed to do. That was contradicted by Exhibit 69, which is actual protocol that is outlined by the drug company. They had a contradiction in what can and cannot be done by each party. I think that was very important to note that that's not necessarily true. Also, I just wanted to really focus on the actual wire. I know the court had noted that Mr. Garmendia testified, and there's two Garmendias, but the Garmendia who was indicted and testified at trial as a co-conspirator. While you can argue he said certain things, the testimony is uncontradicted that my client, Ms. Bortella Martinez, left the business on February 23rd, 2017, and the indictment identified in count two that the charged wire was an October 2nd, 2017 email from Mr. Montalvo to the CRO in North Carolina, and she's not involved in that. She's no longer involved in this process. Based upon that, we don't believe that there is sufficient evidence with regard to that count, and the motion should have been granted. All right. Thank you very much, Mr. Goodman. We'll hear again from Ms. Cain. You've reserved three minutes. Thank you, Your Honors. The government started with their argument that Mr. Montalvo, via his counsel, did not preserve the constitutional dimension of the exclusion of evidence, and I just would redirect the court to what the defense counsel said in their second or maybe third motion for mistrial. They said our defense's intent, and the reason we want to ask the questions of Mr. Bernardo Garmendia is, and what roles between the role division, is that that goes to Mr. Montalvo via his knowledge and his intent to commit the fraud here. The other reason we wanted to cross-examine about the parenthetical FDA audits and the results of the FDA inspection is that it goes to our client's knowledge and intent. I... There's no citing of a rule of evidence, and it is hard for me to conceive of what else he's saying other than, we can't present our defense. You are excluding evidence that goes to the heart of our defense, and I think the court's case law is relatively clear that you don't have to say magic words. He doesn't have to say, this touches on a weighty matter to the defendant. If you say, I can't present my defense, you're excluding evidence that goes right to knowledge and intent, that's our defense. I think that's sufficient to preserve the constitutional dimensions of a right that is just the right to present a complete defense. It's not a more complex right than that. It comes from more than one amendment. You don't have to cite the fifth and sixth amendment in order to preserve that, and the question also is, was the court apprised of why Mr. Montalvo via wanted this evidence and what he wanted the court to do because it was excluded? The answer is yes. He knew this evidence went to Mr. Montalvo via's knowledge and intent, and he knew that the defense council believed this error was so significant that a mistrial should be called, and they made that motion more than once. So I think this constitutional question should be reviewed as harmless beyond a reasonable doubt. I think the government has not made an effort to prove that the exclusion of Mr. Montalvo via's testimony about Bernardo Garmendia's prior roles was harmless beyond a reasonable doubt, or that the exclusion of the FDA inspection results was harmless beyond a reasonable doubt because overwhelming evidence is not per se sufficient to establish that an error is harmless beyond a reasonable doubt. You also have to consider, well, how much would the jury have considered? It's very hard to figure this out, but what would the jury have thought about Mr. Montalvo via's testimony? Would one juror have had a reason to doubt the government's case if this evidence had come in, and we submit to the court that, yes, one juror would have had a reason to doubt the government's case if Mr. Montalvo via had been allowed to present the complete defense to which he was entitled. On Rule 403, Rule 403 is a liberal rule of inclusion with the strong presumption that relevant evidence will be admitted. The government is putting a heavy hand on Rule 403 justifying the exclusion of the FDA audit results. I think if you look at the testimony of Inspector Garmendia, you will see that the jury was told the difference between a regulatory violation and a criminal violation. They understood that difference. The introduction of this evidence would have been clarifying, not confusing. Thank you very much. Thank you. All right. Our next case today is Wright versus the commission.